*Zhang Jingrong, et al. v. Chinese Anti-Cult World Alliance Inc., et al.*

# In the
# United States Court of Appeals
## For the Second Circuit

August Term 2019

(Argued:  October 3, 2019   Decided:  October 14, 2021)

Docket No. 18-2626

ZHANG JINGRONG, ZHOU YANHUA, ZHANG PENG, ZHANG CUIPING, WEI MIN, LO KITSUEN, CAO LINJUN, HU YANG, GUO XIAOFANG, GAO JINYING, CUI LINA, XU TING, BIAN HEXIANG,

*Plaintiffs–Counter-Defendants–Appellees,*

–v.–

CHINESE ANTI-CULT WORLD ALLIANCE INC., MICHAEL CHU, LI HAUHONG, WAN HONGJUAN, ZHU ZIROU,

*Defendants–Counter-Plaintiffs–Appellants,*

DOES 1-5, INCLUSIVE,

*Defendants.*[*]

B e f o r e :

WALKER, LEVAL, and CARNEY, *Circuit Judges.*

---

[*] The Clerk of Court is directed to amend the official case caption as set forth above.

The Freedom of Access to Clinic Entrances Act of 1994 ("FACEA") prohibits a person from intentionally injuring, intimidating, or interfering with another who is exercising her religion "at a place of religious worship." 18 U.S.C. § 248(a)(2). Plaintiffs–Counter-Defendants–Appellees ("Plaintiffs") are Falun Gong practitioners who passed out flyers and displayed posters, primarily protesting the Chinese Communist Party's treatment of Falun Gong, at sidewalk tables in Flushing, Queens, New York. Plaintiffs claim that Defendants–Counter-Plaintiffs–Appellants ("Defendants") harassed them in the vicinity of these tables—the claimed "place of religious worship"—in violation of FACEA. After the parties filed cross-motions for summary judgment, the district court (Weinstein, *J.*) determined that the sidewalk tables were "a place of religious worship" as a matter of law. Rejecting Defendants' constitutional challenge, the district court further held that Congress did not exceed its Commerce Clause authority in enacting § 248(a)(2). On interlocutory appeal, we conclude that "a place of religious worship" means anywhere that religious adherents collectively recognize or religious leadership designates as a space primarily to gather for or hold religious worship activities. The Flushing tables do not qualify because the undisputed record shows that Plaintiffs and their fellow practitioners treated the tables primarily as a base for protesting the Chinese Communist Party's alleged abuses against Falun Gong, rather than for religious worship. Because the § 248(a)(2) claim fails on this statutory ground, we do not reach the constitutional issue. We therefore REVERSE the district court's partial grant of summary judgment to Plaintiffs and its denial of summary judgment to Defendants, and REMAND for further proceedings consistent with this Opinion.

Judge Walker concurs in the court's opinion, and files a separate concurring opinion.

REVERSED AND REMANDED.

TOM M. FINI, Catafago Fini LLP, New York, NY (Edmond W. Wong, Law Office of Edmond W. Wong, PLLC, Flushing, NY, *on the brief*), *for Defendants–Counter-Plaintiffs–Appellants*.

TERRI E. MARSH, Human Rights Law Foundation, Washington, D.C., JAMES A. SONNE, Stanford Law School Religious Liberty Clinic, Stanford, CA (Joshua S. Moskovitz, Bernstein Clarke & Moskovitz PLLC, New York, NY, *on the brief*), *for Plaintiffs–Counter-Defendants–Appellees*.

Sirine Shebaya, Juvaria Khan, Muslim Advocates, Washington, D.C., *for* Amicus Curiae *Muslim Advocates*.

CARNEY, *Circuit Judge*:

This appeal presents the question of whether five tables on the sidewalk in Flushing, Queens, New York—where Plaintiffs–Counter-Defendants–Appellees ("Plaintiffs") passed out flyers and displayed posters primarily protesting the Chinese Communist Party's treatment of Falun Gong—constitute "a place of religious worship" under the Freedom of Access to Clinics Entrances Act ("FACEA"), 18 U.S.C. § 248.

Plaintiffs are adherents of Falun Gong, a modern spiritual practice originating in China. They allege that Defendants–Counter-Plaintiffs–Appellants ("Defendants") harassed, intimidated, and interfered with them when they engaged in activities at the tables. Based on these incidents, Plaintiffs brought a claim under FACEA, 18 U.S.C. § 248(a)(2), which makes it unlawful to intentionally injure, intimidate, or interfere with or to attempt to injure, intimidate, or interfere with a person exercising her religion at "a place of religious worship." They allege that the sidewalk tables are a "place of religious worship."

We hold that "a place of religious worship" is anywhere that religious adherents collectively recognize or religious leadership designates as a space primarily to gather for or hold religious worship activities. We hold further that the tables do not qualify under this definition: at summary judgment, the undisputed record showed that

Plaintiffs and their fellow practitioners treated the tables primarily as a base for protesting and raising public awareness about the Chinese Communist Party's alleged abuses against Falun Gong, rather than for religious worship. Nor was there evidence that the Falun Gong religious leadership had designated the tables as a place primarily to gather for or hold religious worship activities. Accordingly, the § 248(a)(2) claim fails.

Defendants argue separately that the claim cannot be sustained because Congress lacked the authority under the Commerce Clause to enact § 248(a)(2). Because we resolve the appeal on statutory grounds, we do not reach this constitutional issue.

We therefore reverse the district court's grant of partial summary judgment to Plaintiffs and its corresponding denial of summary judgment to Defendants, and remand for further proceedings consistent with this Opinion.

## BACKGROUND

### I.     Statutory Background

FACEA dually protects individuals' access to "reproductive health services" and the free exercise of religion "at a place of religious worship." 18 U.S.C. § 248(a)(1)-(3). Section 248(a)(2) of that statute, at issue here, imposes civil and criminal penalties on any person who:

> by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure, intimidate or interfere with any person lawfully exercising or seeking to exercise the First Amendment right of religious freedom at a place of religious worship.

*Id.* § 248(a)(2). A person is authorized to sue under § 248(a)(2) only if she was "lawfully exercising or seeking to exercise the First Amendment right of religious freedom at a place of religious worship or by the entity that owns or operates such place of religious worship." *Id.* § 248(c)(1)(A). FACEA does not define "a place of religious worship."

4

## II. Factual Background

On this interlocutory appeal from orders on cross-motions for summary judgment, we draw the following undisputed facts from the parties' Local Rule 56.1 statements and the documents, deposition testimony, and evidentiary hearing testimony comprising the summary judgment record. The district court held a three-day evidentiary hearing to supplement the summary judgment record, during which several of the parties' experts and witnesses provided additional testimony. To the extent any issues discussed in the factual narrative are in dispute, we note them below.

### A. Falun Gong

Plaintiffs are practitioners of Falun Gong, a spiritual practice founded in China in 1992 by Li Hongzhi.[1] App'x at 204 (Pls.' Rule 56.1 Statement), 572 (Defs.' Response to Pls.' Rule 56.1 Statement).[2] The basic principle of Falun Gong is that followers strive to "return" to their "True Sel[ves]" or "Primary Soul[s]" through regular spiritual practice known as "cultivation." App'x at 247, 577, 582 (quoting Falun Gong teachings). Cultivation entails meditation, physical exercises like qigong, and the study and application of Li's teachings, which are collected in a book of his lectures entitled "Zhuan Falun." Although Falun Gong lacks "temples, churches, or religious rituals,"

---

[1] Two of the thirteen Plaintiffs, Zhang Cuiping and Bian Hexiang, are not Falun Gong practitioners, but were allegedly attacked on the street in Flushing because they were mistaken as practitioners. *See* App'x at 59-60. Because we find that the tables were not a place of religious worship, we need not determine whether these Plaintiffs could maintain an action under 18 U.S.C. § 248(a)(2).

[2] As reflected in Defendants' response to Plaintiffs' Rule 56.1 statement, Defendants maintained at summary judgment that Falun Gong is not a religion under U.S. law. Because they do not pursue that issue on appeal, we assume without deciding that Falun Gong is a religion for purposes of determining whether the Flushing tables qualify as "a place of religious worship" under 18 U.S.C. § 248.

followers gather at conferences, parades, parks, and spiritual centers. App'x at 621 (quoting Li's statements on Falun Gong practice). Adherents also commonly practice Falun Gong in their homes.

Falun Gong is subject to controversy. Defendants are the Chinese Anti-Cult World Alliance Inc. ("CACWA"), its leaders, and affiliated individuals, who oppose Falun Gong. In their view, Falun Gong is "cult-like" and espouses troubling views. *See, e.g.*, App'x at 585 (Defs.' Response to Pls.' Rule 56.1 Statement). Defendants object, for instance, to Falun Gong teachings that followers should not take medication for illness, that aliens have visited earth, and that the heavens are divided into racial zones and a person of a mixed racial background will "go to the heaven that belongs to the race of his Main Spirit." App'x at 633. Plaintiffs do not dispute that these are Falun Gong teachings. *See* App'x at 609.

Plaintiffs allege that in China, the government harshly persecutes members of Falun Gong. According to U.S. government reports, the Chinese government deems Falun Gong a "cult[]," and has brutally tortured, detained, and imprisoned followers. App'x at 608 (quoting annual reports of the Congressional-Executive Commission on China); *see also* App'x at 606 (quoting State Department's Human Rights Report on China). One Plaintiff recounted that, because he practiced Falun Gong in China, he was "abused and beaten in custody" and "was forced to watch as his mother was beaten in the face" by Chinese authorities. App'x at 593. Plaintiffs also allege that the Chinese government exerts influence against Falun Gong practitioners overseas by encouraging its state-owned enterprises to provide financial support to organizations like CACWA. *See* App'x at 1246-48.

In response to this treatment, Li Hongzhi has urged followers to raise awareness—as Falun Gong practitioners describe it, "to tell the truth"—about the Chinese Communist Party's persecution of practitioners and its malignment of the

movement.[3] *See, e.g.,* App'x at 777 (Plaintiff Cui Lina describing the work of practitioners "to tell the truth of how the Chinese communist party persecute[s] the Falun Gong practitioner"); App'x at 247 ("Supplementary Teachings of Falun Gong" providing that practitioners should do "truth-clarifying work" regarding persecution by the Chinese government).

### B. The Flushing Sidewalk Tables

Located in the Flushing neighborhood of Queens, New York, are two "centers" where Falun Gong practitioners gather. One is the large Taiwan Cultural Center and the other, the much "small[er]" spiritual center (the "Spiritual Center") based in the suite of a building located on Main Street. App'x at 1743, 1747, 1751. The parties do not dispute that the Taiwan Cultural Center is the site of "regular[]" worship and study among practitioners. App'x at 1747; *see* App'x at 1751 (Plaintiffs' witness, a Falun Gong practitioner, explaining that "[w]e make true wishes and pray at Taiwan Center"). Plaintiffs state that practitioners gather at the Spiritual Center "to meditate, exercise, and study in groups." App'x at 1820; *see also* App'x at 1746 (same witness explaining that "[w]e also practice at Spiritual Center.").

During the relevant period of the lawsuit, from 2011 to 2015, Spiritual Center leadership arranged five tables to be set up daily in the same locations and at the same times along the sidewalk in downtown Flushing. The tables displayed a variety of

---

[3] In their testimony and written submissions, the witnesses or parties sometimes refer to the government of the People's Republic of China as the Chinese Communist Party. *See* App'x at 1737-38 (Plaintiffs' witness describing Falun Gong practitioners' efforts in protesting the Chinese government, referred to as the "Chinese Communist Party"); *see also* Taisu Zhang & Tom Ginsburg, *China's Turn Toward Law*, 59 VA. J. INT'L L. 313, 357 (2019); Yi Zhao & Mark Richards, *The Diffusion of the Concept of Public Figure in China*, 53 LAW & SOC'Y REV. 1202, 1205-07 (2019) (discussing China's one-party system). Consequently, we use this nomenclature as well.

posters and images and were staffed by volunteers who handed out flyers. The volunteers also walked up and down the street near the tables to distribute flyers. Most, but not all, of the volunteers were Falun Gong practitioners. *See* App'x at 1740 (describing the volunteers as "mainly" Falun Gong practitioners).

Plaintiffs' witness Yu Yuebin, the director of the Spiritual Center, testified at the evidentiary hearing on the purpose and activities of the tables.[4] In Yu's view, the tables were "part of our spiritual center." App'x at 1738. He explained that the materials displayed at the tables were geared toward raising awareness about the Chinese Communist Party's treatment of Falun Gong:

> Q. What materials are displayed at the tables?
>
> A. We mainly put three kind[s] of materials. First kind, we tell people what is Falun Gong, to reveal the lies about Falun Gong from Chinese Communist Party, the lies that reveal and wrongfully blamed Falun Gong. Second kind, Chinese Communist Party persecute Falun Gong. The third kind is to reveal Chinese Communist Party persecute Falun Gong and to persuade people to withdraw from the party organization.
>
> Q. You said the first category is the materials explain what Falun Gong is, right?
>
> A. Yes. First kind we explain what is Falun Gong—it's a kind of religion for us to practice—to reveal the lies that Chinese [C]ommunist party wrongfully blame Falun Gong.
>
> Q. And are the materials at the table simply there for people to pick up, or are they handed out to people?

---

[4] The record does not contain copies of the materials allegedly displayed at the tables and has little documentation of how the tables physically appeared during the relevant period. Indeed, the parties dispute whether the display and materials at the tables changed over time in response to this litigation. *See, e.g.*, App'x at 1718-19. As a result, we rely on witness testimony to reconstruct the activities and materials at the tables.

A. Mainly we distribute them to people; but some of them, people could pick it up by themselves.

Q. So people who are working at the tables at times will distribute the materials on Main Street.

A. Yes.

App'x at 1738-39.

Yu also described the posters and images displayed at the tables. Some depicted "organ harvesting"—the forcible removal of internal organs—from Falun Gong practitioners allegedly committed by the Chinese government. App'x at 1751-52. Yu testified that he hoped displaying these images would "reveal the evilness of the Chinese Communist Party" and motivate passersby to take action against the persecution:

> Q. So, if I told you that we have photographs showing that there are a lot more organ harvesting photos [at the tables before this litigation commenced] compared to now, your testimony is that you'd disagree with that. Is that your testimony?
>
> A. The organ harvesting is a crime, a sin. That has never happened in the history. It's part of our [sic] tell the truth, to reveal the evilness of Chinese Communist Party, to tell people what's happening in China, to help people. More people can pay attention to it and to stop people being persecuted; and right now, every minute, every second someone organ was being taken. There's no reason for us to decrease that. I think it's normal when it's more or less.
>
> [ . . . . ]
>
> Q. You understand what organ harvesting is, correct?
>
> A. We have materials about organ harvest.
>
> Q. And that material includes posters that show pictures of bodies being cut open and the organs to be harvested, removed?
>
> A. I want them to display less pictures about this kind. Maybe there are some.
>
> [ . . . . ]

9

Q. Okay. And that table that's there does display pictures of organ harvesting, correct?

A. Yes, there is.

Q. Now that poster or those posters displayed, are open for the public to see, correct?

A. Yes.

App'x 1751-55.

Yu further explained that practitioners who staffed the tables engaged in "prayer and promoting the Fa [meaning "law" of Falun Gong]" there. App'x at 1739. As he put it, the tables are "like an extension" of the Spiritual Center "to help to preach and tell the truth, to spread good works to people." App'x at 1738. Yu admitted, however, that "[m]ainly" Falun Gong "exercises" are done "at the parks and at home" rather than around the tables. App'x at 1746.

Plaintiffs who staffed the tables testified consistently with Yu's statements in their depositions. Plaintiff Cui Lina explained that the purpose of the tables was for volunteers to pass out flyers and raise awareness of the "Chinese communist party['s]" organ harvesting and actions against Falun Gong:

Q. But when you're practicing, actually practicing Falun Gong, isn't it the movements and the meditation?

A. Yes.

Q. But you are not doing that at the five tables. At the five tables you are handing out materials? You do the movements and the meditation in the spiritual center and the parks. You are not doing that at the table, right?

[ . . . . ]

A. At a table we pass out fliers. We try to tell the truth of how the Chinese communist party persecute the Falun Gong practitioner. We try to tell the truth about how the communist party harvest organs.

10

Q. Right. But you don't do the meditation or the exercises at the five tables, correct?

A. No, we don't—we don't do meditation.

Q. And you don't do the exercises at the five tables either, correct?

[ . . . . ]

A. That's correct.

App'x at 1788.

Plaintiff Lo Kitsuen likewise testified at her deposition that the tables were "not mainly for worship":

Q. Are the tables a place of worship or are they more to distribute information?

A. There are multiple various printed materials on the table, and we distribute those pamphlets, materials when we tell other people about the truth.

Q. Right. But my question was are the tables actually a place of worship where you actually engage in worship?

[ . . . . ]

A. No. No. It's not mainly for worship, no. Mostly they are for distribution of our flyers.

Q. Where do you Falun Gong practitioners go to worship?

[ . . . . ]

A. When we gather at the Taiwan Center on Northern Boulevard and worship by yourself of [sic] at home. You could do that yourself.

App'x at 1784.

Defendants' expert, Professor Xia Ming, a political scientist who wrote about Falun Gong, regularly observed the tables as part of his "data collection process." App'x at 1695. He testified as follows at the evidentiary hearing:

Q. And what types of materials do you see being displayed and distributed at those tables?

11

A. Yes, so based upon my different encounters, I believe some of them about quitting the Chinese Communist party . . . . Some materials about quitting, some about the organ harvest. Sometimes they have materials about the literature about the Falun Gong about what Falun Gong is, and sometimes they have pictures about organ harvest and also about torture in China.

Q. And just to be clear for the court reporter, did you say there are pictures of organ harvesting?

A. Yeah.

Q. Okay. What is organ harvesting? What are they talking about when they display pictures of organ harvesting?

A. Because it has been claimed by the Falun Gong and many Falun Gong practitioners and they were in jail in China, then they were subject to organ harvesting and so they were put to death and their organs were removed when they were still alive. So, this is what pictures they were about.

[ . . . . ]

Q. Have you seen the tables at Flushing being used to tell the Falun Gong members [sic] are handing out fliers to Chinese Americans on Main Street and saying "You have to quit the Chinese Communist Party." Have you seen that?

A. I did see them hand them. And I was also approached by different Falun Gong practitioners with the pamphlets regarding quitting the Chinese Communist party, and also the organ harvesting materials.

App'x at 1672-73, 1680-81.

At the hearing, Defendant Li Huahong introduced into evidence photographs of the five tables that she took in 2015 and 2016. Li lived near the tables and passed by them every day for over ten years. She described three of the photographs: two showed a banner hanging over a table that said, "Prosecute Jiang Zemin," the former Chinese president. App'x at 1706-07. A third photograph showed a sign by a table that said,

12

according to Li's translation, "To wrong people in this world. And kindness or evilness will get karma or reward." App'x at 1707.

## C. Altercations Between the Parties

Plaintiffs' FACEA claim is based on a series of physical and verbal altercations that took place near the tables from around 2011 until the complaint was filed in 2015.

Plaintiffs allege numerous incidents. In April 2011, Defendant Li Huahong threatened Plaintiff Zhou Yanhua while he passed out flyers by a table. In September 2011, Defendant Zhu Zirou tore down a table display and struck and cursed at Plaintiff Zhou, who was stationed there. In 2014, Defendant Wan Hongjuan threatened or assaulted Plaintiffs Gao Jinying, Hu Yang, Cui Lina, and Zhang Peng, and Defendant Li attacked Plaintiff Lo Kitsuen, all near the tables. In January 2015, Defendant Wan Hongjuan approached Plaintiff Zhang Jingrong at a table, knocked over the table's materials, and threatened that he would "eradicate" Zhang and her fellow practitioners. App'x at 55-56.

Plaintiffs also allege incidents on Main Street in Flushing. For example, in April 2011, Defendant Li threatened Plaintiff Gao "while traveling by foot on Main Street near the Spiritual Center." App'x at 57. In July 2011, Defendants Li and Zhu and "a mob of twenty to thirty people" surrounded and attacked Plaintiffs Li Xiurong and Cao Lijun while they "walked together on Main Street from the Falun Gong site located at 41-70 Main Street to the Spiritual Center." App'x at 58. While participating in a parade in February 2014, supporters of Defendant CACWA verbally attacked Plaintiff Lo.

Defendants vehemently dispute each of these accounts, claiming instead that they were in fact the victims, and not the aggressors, in these incidents.

## III. Procedural History

Based on these and other altercations, Plaintiffs filed this action on March 3, 2015,

13

pleading violations of FACEA in the fifth count of their complaint. The other counts and Defendants' counterclaims are not at issue in this appeal.[5]

After several years of discovery, the parties filed cross-motions for partial summary judgment. Although neither party initially moved for summary judgment on the FACEA claim, the district court *sua sponte* notified the parties that it was "considering summary judgment on all claims and counterclaims" pursuant to Federal Rule of Civil Procedure 56(f) and ordered the parties to "be prepared to defend or oppose summary judgment on all claims and counterclaims." D. Ct. Dkt. No. 130, 15-cv-1046 (E.D.N.Y.).

Following an evidentiary hearing in connection with the cross-motions, the parties submitted supplemental briefing on the FACEA claim. *See* D. Ct. Dkt. No. 165. Plaintiffs sought partial summary judgment, including, as relevant here, that the Flushing tables are "a place of religious worship" under 18 U.S.C. § 248. D. Ct. Dkt. No. 145 at 16-20.[6] Defendants sought summary judgment on the entirety of the claim,

---

[5] The remaining counts include two additional federal law claims (conspiracy to violate civil rights and conspiracy to prevent equal access to public spaces, both under 42 U.S.C. § 1985(3)), and five state law claims (assault and battery, negligence, public nuisance, intentional infliction of emotional distress, and bias-related violence and intimidation under New York Civil Rights Law § 79-n). Defendants assert corresponding counterclaims of assault and battery, negligence, intentional infliction of emotional distress, and violation of New York Civil Rights Law § 79-n. One Defendant, Wan Hongjuan, pled identical counterclaims, except for violation of New York Civil Rights Law § 79-n, in a separate answer.

[6] In their written submissions, Plaintiffs sometimes use broad language to suggest that the claimed "place of religious worship" is not just the Flushing sidewalk tables, but the Spiritual Center itself. *See, e.g.,* D. Ct. Dkt. No. 145 at 16 (at summary judgment, Plaintiffs arguing that "*the Spiritual Center* and its extensions, including the Spiritual Center's five site tables, are 'places of religious worship.'") (emphasis added). Despite this language, Plaintiffs' FACEA claim in substance is based only on attacks near the tables or on the public street in Flushing. *See* Section II.C, *supra*. Plaintiffs likewise have focused on arguing

14

arguing that the tables are not "a place of religious worship" because they were not "used primarily for worship" and therefore the claim failed. D. Ct. Dkt. No. 146 at 6-9. Defendants further moved for summary judgment on the ground that Congress exceeded its authority in enacting § 248(a)(2), which regulates only "local, non-economic" activity not affecting interstate commerce. D. Ct. Dkt. No. 172 at 11.

The district court rendered its decision in two orders, one issued on April 23, 2018, and one on May 30, 2018. In the first, it granted partial summary judgment to Plaintiffs, concluding that the tables are a qualifying "place of religious worship" and denying Defendants' corresponding motion. *Zhang Jingrong v. Chinese Anti-Cult World All.*, 311 F. Supp. 3d 514, 522, 553-55 (E.D.N.Y. 2018) ("*Zhang I*").[7] The district court further ruled that, to avoid effecting a preference for certain religions over others, which would violate of the Establishment Clause, "[*a*]*ny place a religion is practiced* is protected by a constitutional construction of" the phrase "place of religious worship." *Id.* at 553-54 (emphasis added) (citing *Everson v. Bd. of Ed. of Ewing Twp.*, 330 U.S. 1, 15 (1947) ("The 'establishment of religion' clause of the First Amendment means at least this: Neither a

---

that the tables themselves, and not the Spiritual Center, are the qualifying "place of religious worship" in this case. *See*, *e.g.*, D. Ct. Dkt. No. 145 at 16, 18 ("The Spiritual Center's five site tables are the functional equivalents of places of worship."). Consequently, the FACEA claim is viable only if the tables are deemed a "place of religious worship." Assuming that the Spiritual Center qualifies as a "place of religious worship"—an issue on which we express no view—Plaintiffs have failed to show that the tables are adjacent or sufficiently near to the Spiritual Center to be deemed an extension of the Spiritual Center for our analytic purposes. *See* Section II.C, *supra*. We also disagree with the district court's statement that Plaintiffs pleaded "incidents of violence and intimidation *at* or around the Falun Gong Temple." *See Zhang Jingrong v. Chinese Anti-Cult World All.*, 311 F. Supp. 3d 514, 562, 564 (E.D.N.Y. 2018) ("*Zhang I*") (emphasis added). As the catalogue of alleged incidents in the district court's opinion shows, the incidents all occurred near the tables or on the street in Flushing, not "at" a "Falun Gong Temple." *Id.* at 533-35.

[7] Unless otherwise noted, in quoting case law, this Opinion omits all alterations, citations, footnotes, and internal quotation marks.

15

state nor the Federal Government can . . . . prefer one religion over another.")). Thus, the district court found that "a place of religious worship" under § 248(a)(2) is not limited to "fixed" structures like "temples," but also includes "transitory locations" such as Plaintiffs' tables. *Id.* at 554. The district court further rejected the proposition that a "place of religious worship" means a "structure or place used *primarily* for worship," an interpretation that it characterized as deriving only from the legislative history rather than text of the statute. *Id.* (quoting H.R. REP NO. 103–488, at 9 (Conf. Rep.) (1994), *as reprinted in* 1994 U.S.C.C.A.N. 724, 726 (Section 248 "covers only conduct occurring at or in the immediate vicinity of a place of religious worship, such as a church, synagogue or other structure or place used primarily for worship")). In the district court's view, because Plaintiffs' activities at the tables included religious practice in the form of proselytizing, the tables constituted "a place of religious worship." *See id.*

In the second order, dated May 30, 2018, the district court denied Defendants' motion for summary judgment based on the Commerce Clause challenge to § 248(a)(2). *See Zhang Jingrong v. Chinese Anti-Cult World All.*, 314 F. Supp. 3d 420 (E.D.N.Y. 2018) ("*Zhang II*"). It concluded that, because the provision proscribes misconduct "at a place of religious worship," Congress was permissibly regulating "economic activity" substantially affecting interstate commerce as the Commerce Clause authorizes. *See id.* at 439-40 (quoting *United States v. Morrison*, 529 U.S. 598, 609 (2000) (The Commerce Clause permits Congress to regulate "those activities that substantially affect interstate commerce")). In support, the district court found that "[p]laces of religious worship— even interpreted broadly to avoid an issue under the First Amendment['s Establishment Clause]—are economic" in light of their substantial collective annual revenue, "account[ing] for 1% of gross national product in the United States and half of all charitable giving." *Id.* at 440. It reasoned that "violence and intimidation at places of

religious worship can deter people from participating in religious-based, commercial activity," thereby affecting interstate commerce. *Id.*

In light of the novelty and complexity of the issues, the district court certified both *Zhang I* and *II* for interlocutory appeal. *See id.* at 424-25. It noted that "[a] two month jury trial looms—demanding substantial time, effort, and money of the parties, a jury, and the court. Prudence dictates that this case not be tried with a substantial, dispositive question of constitutional law" or a question on "the scope of FACEA" left undecided. *Id.* at 424.

We now reverse the order issued in *Zhang I* to the extent it interprets the phrase "a place of religious worship" and concludes that the tables qualify as such under § 248(a)(2). Because the FACEA claim fails on this statutory ground, we do not reach the Commerce Clause issue ruled on in *Zhang II*.

## DISCUSSION

"We review a district court's grant of summary judgment *de novo* where the parties filed cross-motions for summary judgment and the district court granted one motion but denied the other." *Atlas Air, Inc. v. Int'l Bhd. of Teamsters*, 943 F.3d 568, 576-77 (2d Cir. 2019). "[W]e evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Byrne v. Rutledge*, 623 F.3d 46, 53 (2d Cir. 2010). We may find for the movant defendant "only if we conclude that on the record presented, considered in the light most favorable to [the non-movant plaintiff], no reasonable jury could find in his favor on his claim[]." *Capobianco v. City of New York*, 422 F.3d 47, 54-55 (2d Cir. 2005). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v.*

*Harris*, 550 U.S. 372, 380 (2007). Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## I. Meaning of "Place of Religious Worship"

Plaintiffs' FACEA claim turns on the meaning of the critical statutory term "place of religious worship." Section 248(a)(2) does not define the term. On review of the statutory text and legislative history, we conclude that the term means a space devoted primarily to religious worship activity—that is, anywhere that religious adherents collectively recognize or religious leadership designates as a place primarily to gather for or to hold religious worship activities.[8]

### A. Plain Meaning

When interpreting a statute, we begin with the text. We must give effect to the text's plain meaning. Plain meaning "does not turn solely on dictionary definitions"; rather, it draws on "the specific context in which that language is used, and the broader context of the statute as a whole." *United States v. Rowland*, 826 F.3d 100, 108 (2d Cir. 2016). Where the plain meaning of the text is clear, our inquiry "generally end[s] there." *United States v. Balde*, 943 F.3d 73, 81 (2d Cir. 2019).

We conclude that the phrase "a place of religious worship," in context, is susceptible to multiple reasonable interpretations. A "place" is a "location," "a particular part or region of space," "a space that can be occupied." *Place*, Oxford English

---

[8] In interpreting "a place of religious worship" as a space that religious adherents collectively recognize, we do not mean to suggest that a single religious adherent could not designate "a place of religious worship" if his religion authorized this practice. In such a case, although the action might be undertaken by one person, other religious adherents would still collectively recognize the space as "a place of religious worship" because the designation would be rooted in a shared religious tradition and practice.

18

Dictionary ("OED") (3d ed. 2006), https://www.oed.com/view/Entry/144864; *see also Place*, Merriam-Webster Dictionary ("M-W"), https://www.merriam-webster.com/dictionary/place. When "place" is joined with "of," the phrase "place of" may denote a "place" whose defining feature or purpose is identified in the terms following the preposition "of." *See*, *e.g.*, *Place*, OED (explaining that "place of" is typically accompanied by a "qualification indicating the purpose" of the "place," so that the entire phrase means a "building, establishment, or area *devoted* to a particular purpose" (emphasis added)); *Place*, M-W ("place of" is a construction denoting a "locality used *for a special purpose*" (emphasis added)). In some contexts, however, the words following "place of" merely describe an incidental feature of the location, rather than its primary purpose. For example, the sentence "The town launderette is a place of lively, well-informed conversations," does not denote that the establishment primarily serves as a forum for discourse as opposed to cleaning clothes. The common phrases "place of birth," "place of employment," and "place of wrong" likewise denote one activity or event that occurs at the location, but not necessarily its primary purpose. *See Place of Employment*; *Place of Wrong*, Black's Law Dictionary (11th ed. 2019); *Birthplace*, M-W (defined as "place of birth or origin").

All of this is to suggest that "place of worship" is susceptible to more than one plausible interpretation. For instance, a "place of worship" is defined as "a place where believers regularly meet for religious worship, esp. a building designed for or dedicated [to] this purpose." *Place*, OED. The latter part of the definition confirms that the phrase is often used to refer to buildings whose primary purpose is to host meetings of religious worship, as Defendants contend. But, as the first clause suggests, a "place of worship" may also refer to any place where adherents "regularly meet for religious worship"—a meaning that may encompass regular sites of worship primarily used for other purposes, such as a public-school classroom where a religious student group

19

meets at lunchtime or a café where believers gather to study and discuss religious texts. *Id.*

Nor can we conclusively ascertain the plain meaning of the text when it is placed in the context of the statute. A person is protected under § 248(a)(2) only if he is both "exercising or seeking to exercise the First Amendment right of religious freedom" and is "at a place of religious worship" at the time. At first glance, the phrase "a place of religious worship" may appear to be surplusage if it means any location where religious worship occurs: under that reading, the statute redundantly protects a person worshipping at any place where a person worships. But the phrase "exercising or seeking to exercise the First Amendment right of religious freedom" could reasonably be read to refer to a broader range of activities than religious worship itself. Contextual clues from the statute, accordingly, do not provide much clarity.

The district court ruled that, under the plain language of § 248(a)(2), "any place a religion is practiced" must be understood to qualify as a "place of religious worship." *Zhang I*, 311 F. Supp. 3d at 553-54. In so finding, it concluded that interpreting the phrase to mean a place whose primary purpose is religious worship is atextual and imported from the legislative history only. *Id.* at 554. It is true that the words "primary purpose" are not found in the statute, but in light of the common usage of the phrase "place of [an activity]," we are constrained to disagree with the able District Judge that the provision's plain language forecloses this interpretation. As just discussed, "a place of" is a grammatical construction that may denote that the "place" in question is one where the activity described after the word "of" predominates: the fundamental purpose of that "place" is defined by that activity. A "place of religious worship," as used in the statute, could reasonably be interpreted to refer to a place primarily dedicated to religious worship. Although this is not the only possible construction of the statute, it certainly is a permissible one.

20

B.    Legislative History

Having found the statutory language to be ambiguous, "we turn to the provision's legislative history" to determine its meaning. *Panjiva, Inc. v. United States Customs & Border Prot.*, 975 F.3d 171, 180 (2d Cir. 2020). Through this analysis, "we must construct an interpretation that comports with the statute's primary purpose and does not lead to anomalous or unreasonable results." *Puello v. Bureau of Citizenship & Immigr. Servs.*, 511 F.3d 324, 327 (2d Cir. 2007).

We conclude that the legislative history compels reading the phrase "place of religious worship" to mean a place recognized or dedicated as one primarily used for religious worship. "[N]ext to the statute itself," the Joint Conference Report prepared in conjunction with the legislation's passage, and upon which Plaintiffs here rely, "is the most persuasive evidence of congressional intent." *Disabled in Action of Metro. New York v. Hammons*, 202 F.3d 110, 124 (2d Cir. 2000). The Joint Conference Report strongly supports our interpretation. In describing the House's modifications to the provision, the Report emphasized that the law "covers only conduct occurring at or in the immediate vicinity of a place of religious worship, such as a church, synagogue or other structure or place *used primarily for worship*." H.R. REP. NO. 103–488, at 9 (Conf. Rep.) (1994) (emphasis added). This statement clarifies that Congress did not intend all locations where incidental worship activities occur to qualify as "place[s] of religious worship."

The interpretation supplied by the Joint Conference Report is consistent with the purpose of the statute, which is to protect persons subject to injury, intimidation, or interference at certain physical locations. As discussed above, § 248 protects persons who are practicing their religion at "place[s] of religious worship," not persons practicing their religion anywhere. The statute both protects individuals in the vicinity of such places, as well as the "property of a place of religious worship" from

21

"intentional[] damage[] or destr[uction]." 18 U.S.C. § 248(a)(3). This place-oriented focus is paralleled in the statute's protection of the property or persons "obtaining or providing reproductive health services" at a "facility" that serves such a purpose. 18 U.S.C. § 248(a)(1), (3). It makes sense that Congress would not have intended the scope of covered places to extend to the wide variety of locations where an individual may engage in religious worship, but which are not primarily used for that purpose, such as one's home.

Nor does the "primary purpose" construction violate the Establishment Clause. Like the district court, we agree that "[r]eligious worship and the places it occurs come in numerous forms," and therefore, "a place of religious worship" "require[s] a flexible interpretation." *Zhang I*, 311 F. Supp. at 553. But Congress may select as its regulatory agenda the protection of certain broad categories of places, as it did here. What Congress may not do is to prefer the "places of religious worship" of certain religions over those of others. *See Everson*, 330 U.S. at 15 (explaining that the Establishment Clause forbids Congress from "prefer[ring] one religion over another"). Accordingly, we cannot interpret "a place of religious worship" as imposing any particular conceptual, physical, or temporal requirements. "Places of religious worship" may be fixed or moveable, enduring or temporary, bounded within a structure or structureless. But the basic feature of "a place of religious worship," as understood by Congress, is that religious adherents collectively recognize or religious leadership designates the place as one primarily for religious worship. To the extent a religion may disavow the concept of designating any particular locations for worship, we respectfully are of the view that this hypothetical addresses a circumstance distinct from Congress's regulatory focus in § 248(a)—namely, the protection of persons exercising their First Amendment rights to practice religion at physical locations primarily devoted to religious worship.

Defendants urge us to adopt instead a narrow interpretation and construe "a place of religious worship" to mean only fixed structures. We reject that view for the reasons just discussed. The text of § 248 contains no such limitation. A "place" broadly means a point "in space," but that point need not be fixed or have any particular physical feature or structure. *See Place*, OED. Moreover, the Joint Conference Report states that the statute "covers only conduct occurring at or in the immediate vicinity of a place of religious worship, such as a church, synagogue *or other structure or place* used primarily for worship." H.R. Rep No. 103–488, at 9 (Conf. Rep.) (1994) (emphasis added). The phrase "other structure or place" suggests that Congress specifically contemplated a definition of "place" that would extend beyond structures. Although some "places of religious worship" are fixed structures like churches, mosques, or temples, adherents of other religions may worship in spaces that are not so fixed or enclosed. *See, e.g.*, Kristen A. Carpenter, *Living the Sacred: Indigenous Peoples and Religious Freedom*, 134 HARV. L. REV. 2103, 2113 (2021) (book review of Michael McNally's DEFEND THE SACRED: NATIVE AMERICAN RELIGIOUS FREEDOM BEYOND THE FIRST AMENDMENT) (noting that certain "Indigenous religious rituals" are practiced at a designated "sacred site" in nature rather than in fixed structures like a "church, temple, or mosque"). We see no reason why, if such religions designate these spaces as primarily for religious worship during a given period of time, these spaces would not qualify as "place[s] of religious worship" under the statute.

## II. The Flushing Tables Are Not a "Place of Religious Worship"

Turning to the record here, we conclude that no reasonable jury could find that the Flushing tables are "a place of religious worship" in the sense that they are a place whose primary purpose is religious worship. The undisputed evidence shows that Plaintiffs and their witnesses characterized the tables primarily as a site for political protest activity against the Chinese Communist Party, even if some incidental religious

practice took place at the tables. Consequently, the tables are not a space that Falun Gong adherents collectively recognized or its leadership designated as primarily for religious worship.

Plaintiffs moved for partial summary judgment on the issue that the tables are "a place of religious worship." Defendants correspondingly sought summary judgment on the entirety of the § 248(a)(2) claim, contending that Plaintiffs could not adduce sufficient evidence to prove at trial that the tables are "a place of religious worship." *See Capobianco*, 422 F.3d at 54-55 (summary judgment is proper where the record shows that "no reasonable jury could find in [the non-movant's] favor"). We agree with Defendants.

Construing the record in the light most favorable to Plaintiffs, as we must on Defendants' motion, we find that the key facts compelling our conclusion are not in dispute. At the direction of the leadership of the Spiritual Center, the tables were set up daily in five locations in downtown Flushing. The tables were used to display certain materials and make them available to passersby. Volunteers who staffed the tables handed out materials either from the tables or when walking up and down the street near the tables.

The director of the Spiritual Center explained at the evidentiary hearing that the materials displayed at the tables fell into three categories, all of which pertain to protesting the Chinese Communist Party's treatment of Falun Gong. The first category "tell[s] people what is Falun Gong, to reveal the lies about Falun Gong from [the] Chinese Communist Party, the lies that reveal and wrongfully blame[] Falun Gong." App'x at 1738. The second category informs the public that the "Chinese Communist Party persecute[s] Falun Gong." App'x at 1738. And the third category of materials "persuade[s] people to withdraw from the party organization." App'x at 1738. When asked to clarify the first category, the director reiterated that the materials explain what

24

Falun Gong is with the aim of exposing the Chinese Communist Party's propaganda and malignment of the group. *See* App'x at 1738 ("Q. You said the first category is the materials explain what Falun Gong is, right? A. Yes. First kind we explain what is Falun Gong – it's a kind of religion for us to practice – *to reveal the lies that Chinese [C]ommunist party wrongfully blame Falun Gong*." (emphasis added)). The director also described the organ harvesting photos at the tables, intended to spur public action against the Chinese Communist Party: "The organ harvesting is a crime, a sin. That has never happened in the history. It's part of our [sic] tell the truth, to reveal the evilness of Chinese Communist Party, to tell people what's happening in China, to help people. More people can pay attention to it and to stop people being persecuted; and right now, every minute, every second someone['s] organ was being taken." App'x at 1751-52.

In their depositions, Plaintiffs who staffed the tables testified consistently that the primary activity at the tables was not religious worship, but raising awareness of the Chinese Communist Party's abuses. For instance, when asked whether "the tables actually [are] a place of worship where you actually engage in worship," Plaintiff Lo Kitsune responded, "No. No. *It's not mainly for worship*, no. Mostly they are for distribution of our flyers." App'x at 1784 (emphasis added). Plaintiff Cui Lina described the purpose of the tables in a similar vein: "At a table we pass out fliers. We try to tell the truth of how the Chinese communist party persecute[s] the Falun Gong practitioner. We try to tell the truth about how the communist party harvest[s] organs." App'x at 1788. Plaintiff Cao Lijuan agreed that practitioners do "not really practic[e] Falun Gong" at the tables. App'x at 1792. Other evidence in the record corroborates these descriptions of the political orientation of the tables. For instance, pictures taken of the table showed a banner that stated, "Prosecute Jiang Zemin," the former Chinese president. App'x at 1707.

The record also contains undisputed evidence of certain locations where Falun Gong practitioners habitually worship. They include the Taiwan Center where practitioners pray and study together, parks where they do qigong exercises, and practitioners' own homes where they meditate. The Spiritual Center director testified that "[m]ainly" Falun Gong "exercises" are done "at the parks and at home." App'x at 1746. Plaintiff Cui Lina similarly testified that "practicing Falun Gong" consists of meditation and exercises mainly, which do not occur the tables. App'x at 1788. When asked "where . . . Falun Gong practitioners go to worship," Plaintiff Lo Kitsuen responded, "we gather at the Taiwan Center on Northern Boulevard and worship by [ourselves] . . . at home." App'x at 1784.

Certainly, the record contains some evidence that volunteers who staffed the tables would pray or "promot[e] the Fa" there. *See*, *e.g.*, App'x at 1739. But the issue is not whether there is any evidence that worship activities sometimes occurred at the tables. Rather, we must determine whether there is sufficient evidence for a reasonable jury to conclude that the primary purpose of the tables is religious worship. Consider the distinction between two hypotheticals: members of a sports team form a prayer circle on a field before a game but do not conceive of that field as "a place of religious worship" in their religious tradition. By contrast, adherents of a particular religion rent a secular facility to conduct their daily or weekly church services and conceive of that space as devoted to religious worship during that time. Although religious worship is taking place in both examples, only the latter circumstance involves "a place of religious worship" because religious adherents have so designated that space for that primary purpose. The record here shows that at most that there were only sporadic instances of worship at the tables. Plaintiffs and their fellow practitioners instead understood the primary purpose of the tables as a site from which to disseminate information about the Chinese Communist Party's treatment of Falun Gong.

26

The record likewise contains insufficient evidence for a reasonable jury to find that the primary purpose of the tables was proselytizing, a protected religious practice. *See Murdock v. Pennsylvania*, 319 U.S. 105, 110 (1943) ("[S]preading one's religious beliefs . . . is an age-old type of evangelism with as high a claim to constitutional protection as the more orthodox types."). Rather, the evidence consistently shows that practitioners disseminated information about Falun Gong toward exposing the Chinese Communist Party's alleged defamatory propaganda against the group. The actions encouraged by the tables' materials included quitting the Communist Party, stopping organ harvesting, and mobilizing for punishment of Chinese leaders like Jiang Zemin—not joining Falun Gong per se. Although there is evidence that the Falun Gong leader encouraged this activity, a reasonable jury could not conclude that his call to action to raise awareness of the Chinese Communist Party's abuses transformed this activity into religious worship. *See*, *e.g.*, App'x at 247 (excerpts of "Supplementary Teachings of Falun Gong" providing that, "Of course, many students have been quietly doing *large amounts of truth-clarifying work—passing out flyers*, making phone calls, using the Internet, going to the consulates, and using all different forms of media *to tell the world's people the truth about Dafa and to expose the evil's persecution*." (emphases added)). At most, the evidence shows that the activity at the tables was motivated by teachings of the Falun Gong leader, akin to how Quaker groups may protest wars or Catholic groups may protest abortion laws in public streets motivated by their respective religious beliefs. But that such political and social action may be rooted in religious belief does not transform the public spaces where the action occurs into "places of religious worship."

Reviewing the full record in the light most favorable to Plaintiffs, we conclude that it contains insufficient evidence for a reasonable jury to find at trial that the primary purpose of the tables was religious worship. Rather, the undisputed evidence shows that activities at the tables were primarily aimed at exposing and motivating

27

action against the Chinese Communist Party for its alleged abuses against Falun Gong, even if some religious activity may have incidentally or occasionally occurred at the tables. The § 248(a)(2) claim therefore fails.[9]

In light of this resolution, we do not reach the merits of Defendants' constitutional challenge to § 248(a) under the Commerce Clause.

## CONCLUSION

The April 23, 2018 order of the district court is **REVERSED** to the extent that it interprets "a place of religious worship" in 18 U.S.C. § 248(a)(2) and concludes that the Flushing tables qualify. This case is **REMANDED** for further proceedings consistent with this Opinion.

---

[9] We note that, with the § 248(a)(2) claim eliminated, no federal claims remain in the suit because the district court dismissed the other federal claims at summary judgment. *See Zhang I*, 311 F. Supp. 3d 514. On remand, the district court may determine in its discretion whether to retain supplemental jurisdiction over the surviving state law claims expected to proceed to trial. *See Wright v. Musanti*, 887 F.3d 577, 582 n.2 (2d Cir. 2018) ("[A court] may, at its discretion, exercise supplemental jurisdiction over state law claims even where it has dismissed all claims over which it had original jurisdiction.").

JOHN M. WALKER, JR., *Circuit Judge*, concurring:

Although I agree with the majority's reasoning that FACEA does not protect the Falun Gong tables as places of religious worship, I am convinced that the conduct is beyond Congress' Commerce Clause authority to regulate and would dismiss plaintiffs' claim on that basis as well.

In prohibiting violence against worshippers at places of religious worship, FACEA regulates local, non-economic conduct that has at best a tenuous connection to interstate commerce. The Supreme Court in *United States v. Lopez* and *United States v. Morrison* expressly rejected the notion that the commerce power reaches "noneconomic, violent criminal conduct" of the sort proscribed here "based solely on that conduct's aggregate effect on interstate commerce."[1] I therefore would reach and sustain the Commerce Clause challenge to the religious exercise provision of FACEA, 18 U.S.C. § 248(a)(2), and would reverse the district court's denial of summary judgment to defendants.

The Supreme Court has identified three categories of conduct that Congress may regulate under the Commerce Clause: (1) "the use of the channels of interstate commerce"; (2) "the instrumentalities of

---

[1] *United States v. Morrison*, 529 U.S. 598, 617 (2000); *see also United States v. Lopez*, 514 U.S. 549, 565–67 (1995).

interstate commerce, or persons or things in interstate commerce"; and (3) "those activities that substantially affect interstate commerce."[2] The regulated conduct in this case, violence against worshippers at places of religious worship claimed here, can reasonably pertain only to the third category. To determine whether a regulated activity substantially affects interstate commerce, we consider four factors: (i) whether the statute regulates economic activity, (ii) whether the statute contains an "express jurisdictional element" to establish a connection to interstate commerce, (iii) whether the legislative history includes express findings on the activity's effects on interstate commerce, and (iv) whether the link between the activity and a substantial effect on interstate commerce is too attenuated to bring the activity within the Commerce Clause's reach.[3] Each of these factors counsels against upholding § 248(a)(2).

First, and most importantly, nothing about the regulated conduct is economic in nature. The Supreme Court in *United States v. Lopez* emphasized that it has considered only *economic* intrastate activity, as opposed to non-economic intrastate activity, to substantially affect interstate commerce.[4] The Court surveyed

---

[2] *Lopez*, 514 U.S. at 558–59.

[3] *Morrison*, 529 U.S. at 609–12.

[4] *Lopez*, 514 U.S. at 559–60.

congressional Acts that it had upheld which included those that regulated intrastate coal mining,[5] extortionate intrastate credit transactions,[6] restaurants using substantial interstate supplies,[7] inns and hotels catering to interstate guests,[8] and production and consumption of homegrown wheat.[9]  The Court emphasized in *Lopez* that "the pattern is clear":  statutes that regulated *economic* intrastate activity have been sustained as proper exercises of Congress' commerce power.[10]

The Supreme Court reaffirmed the centrality of the economic activity component in *United States v. Morrison*, which concerned a Commerce Clause challenge to the Violence Against Women Act (VAWA).  The Court struck down the law because the regulated conduct, gender-motivated violence, was "not, in any sense of the phrase, economic activity."[11]  The Court criticized petitioners and the dissent for "downplay[ing] the role that the economic nature of the

---

[5] *Hodel v. Va. Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264 (1981).

[6] *Perez v. United States*, 402 U.S. 146 (1971).

[7] *Katzenbach v. McClung*, 379 U.S. 294 (1964).

[8] *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241 (1964).

[9] *Wickard v. Filburn*, 317 U.S. 111 (1942).

[10] 514 U.S. at 560; *see also Morrison*, 529 U.S. at 610 (observing that "a fair reading of *Lopez* shows that the noneconomic, criminal nature of the conduct at issue was central to our decision" to strike down the challenged statute in that case).

[11] *Morrison*, 529 U.S. at 613.

regulated activity plays in our Commerce Clause analysis," a consideration the Court found "central" to its analysis in past cases.[12]

Although it stopped short of "adopt[ing] a categorical rule against aggregating the effects of any noneconomic activity in order to decide these cases," the Court emphasized that "thus far in our Nation's history our cases have upheld Commerce Clause regulation of intrastate activity only where that activity is economic in nature."[13] Absent an economic nexus or a jurisdictional requirement in the statute tying the conduct to interstate commerce, congressional findings standing alone could not sustain VAWA's constitutionality.[14]

Applying the lessons of *Lopez* and *Morrison*, the Court in *Gonzales v. Raich* upheld provisions of the federal Controlled Substances Act (CSA) that made it unlawful to possess, obtain, or manufacture cannabis for personal medical use, which was legal under California law.[15] Respondent Monson cultivated and used her own marijuana, and Respondent Raich relied on two "caregivers" to "provide her with locally grown marijuana at no charge."[16]

---

[12] *Id.* at 610.

[13] *Id.* at 613.

[14] *Id.* at 613-14.

[15] 545 U.S. 1, 7 (2005).

[16] *Id.*

4

Distinguishing Monson's and Raich's activities from the conduct in *Lopez* and *Morrison*, the Court explicitly rejected the Ninth Circuit's "heavy reliance" on those cases when that court concluded that Congress had exceeded its commerce power.[17] Whereas the statutes struck down in *Lopez* and *Morrison*, proscribing local criminal activity, lacked any nexus with interstate commerce, the CSA regulated the "quintessentially economic" activities of "production, distribution, and consumption of commodities for which there is an established, and lucrative, interstate market."[18]

*Raich* follows from the Court's "striking[ly]" similar decision six decades earlier in *Wickard v. Filburn*.[19] In *Wickard*, the Supreme Court upheld a statute directed at "control[ling] the volume [of wheat] moving in interstate and foreign commerce" to stabilize supply and prices even though Wickard intended to grow wheat only for his own consumption.[20] *Wickard*, the *Raich* Court stated, "firmly establishe[d]" that the commerce power includes the "power to regulate purely local activities that are part of an economic class of activities that have a substantial effect on interstate commerce."[21] The

---

[17] *Id.* at 9; *see id.* at 23–26.

[18] *Id.* at 25–26.

[19] 317 U.S. 111 (1942); *see also Raich*, 545 U.S. at 18.

[20] 317 U.S. at 115.

[21] *Raich*, 545 U.S. at 17 (internal quotation marks omitted).

*Raich* Court observed that Congress may reach a purely intrastate activity—even one that is not itself commercial because it does not involve a purchase or sale—if it finds that the failure to regulate that class of intrastate activity would "undercut the regulation of the interstate market in that commodity."[22] The Court concluded that the marijuana home growers in that case, like the *Wickard* farmer, were cultivating "a fungible commodity."[23] Congress could have found that the production of marijuana for home consumption in the aggregate would have a "substantial effect" on supply and demand in the greater interstate market for marijuana.[24] Thus, the CSA fell within Congress' commerce power.

Applying these principles to the relevant provision of FACEA, the regulated conduct in this case cannot be viewed as economic. Whether the relevant regulated activity under 18 U.S.C. § 248(a)(2) is either religious practice at a "place of religious worship" or violence against those worshippers and proselytizers at places of religious worship, neither activity is economic. Neither worship nor violence against worshippers affects the production, distribution, or consumption of a commodity in an interstate (or any) market. To be

---

[22] *Id.* at 18; *see also Wickard*, 317 U.S. at 127–28.

[23] *Raich*, 545 U.S. at 18.

[24] *See id.* at 18–19.

sure, the precise activities at issue in *Wickard* and *Raich* were not commercial, in that the subsets of wheat and marijuana were not being purchased or sold.  But they were economic enterprises that, in the aggregate, would have a direct economic effect on the interstate market for each commodity.  The statutes in *Wickard* and *Raich*, by "restrict[ing] the amount which may be produced for market," limited "the extent . . . to which one may forestall resort to the market by producing to meet his own needs."[25]  No such economic effect can be found here.  Neither plaintiffs, by practicing their religion, proselytizing, or protesting the Chinese government's opposition to Falun Gong, nor defendants, by engaging in violence against plaintiffs, fulfill a need locally that they would otherwise fulfill by purchasing some commodity on an interstate market.

In my view, § 248(a)(2) suffers from the same infirmity as the statute struck down in *Lopez*, a provision of the Gun-Free School Zones Act of 1990[26] that prohibited knowing possession of a firearm in a place known or reasonably believed to be a school zone.[27]  The Court observed that the provision at issue was "a criminal statute that by its terms has nothing to do with 'commerce' or any sort of

---

[25] *Wickard*, 317 U.S. at 127; *Raich*, 545 U.S. at 18 (quoting same).

[26] 18 U.S.C. § 922(q)(1)(A).

[27] *See* 514 U.S. at 551.

economic enterprise."[28]  Possession of a gun in a local school zone is not an activity that, through repetition, would substantially affect interstate commerce.[29]  So too here.  Neither worship nor violence against worshippers is economic activity nor would repetition of either generate a substantial effect on interstate commerce.

The second and third *Lopez/Morrison* factors, the presence of a jurisdictional requirement in the statute limiting the statute's reach to conduct with a connection to interstate commerce, and legislative findings on the activity's effect on interstate commerce, each also weigh against upholding § 248(a)(2).  Like the statutes in *Lopez* and *Morrison*, FACEA contains no congressional pronouncement that would tie the proscribed conduct to activity affecting interstate commerce.[30]  Nor does the legislative history contain any findings that connects acts of worship or violence against worshippers at places of religious worship to interstate commerce.  Although we have previously sustained the provision of FACEA that prohibits violence at abortion clinics, in part based on legislative findings that women, doctors, and medical supplies may travel interstate for reproductive health services,[31] those findings were limited to

---

[28] *Id.* at 561.

[29] *Id.* at 567.

[30] *Lopez*, 514 U.S. at 561; *Morrison*, 529 U.S. at 613.

[31] *United States v. Weslin*, 156 F.3d 292, 296 (2d Cir. 1998) (per curiam).

regulating violence at abortion clinics. They have no bearing on whether violence against worshippers at places of religious worship substantially affects interstate commerce. To be sure, the presence or absence of congressional findings is not dispositive to whether a statute is within Congress' commerce power. But it is telling here that Congress made specific interstate commerce findings as to abortion clinics but not to places of religious worship.

Section 248(a)(2) is also distinguishable from the Church Arson Prevention Act of 1996, which imposes federal criminal penalties for the destruction of "religious real property."[32] In rejecting a Commerce Clause challenge to the Act,[33] the Tenth Circuit noted that it contained an express jurisdictional nexus[34] and recited legislative findings that "arson or other destruction or vandalism of places of religious worship . . . pose a serious national problem" that "warrant[s] Federal intervention."[35] The legislative history of the Church Arson Prevention Act also referenced a "broad range" of commercial activities in which churches engage, "including social

---

[32] 18 U.S.C. § 247.

[33] *See United States v. Grassie,* 237 F.3d 1199 (10th Cir. 2001).

[34] *Id.* at 1209 (citing Church Arson Prevention Act of 1996, Pub. L. No. 104–155, § 2, 110 Stat. 1392 (1996) ("Congress has authority, pursuant to the Commerce Clause of the Constitution, to make acts of destruction or damage to religious property a violation of Federal law.").

[35] *Id.*

services, educational and religious activities, the purchase and distribution of goods and services, civil participation, and the collection and distribution of funds for these and other activities across state lines."[36] Although Congress made specific commerce findings regarding religious real property, it made no such findings relating to § 248(a)(2), which importantly regulates violence against persons, not real property.

Finally, the link between the regulated activity in this case and any effect on interstate commerce is far too attenuated to offset the other factors. The Supreme Court in *Morrison* made clear that "[t]he Constitution requires a distinction between what is truly national and what is truly local," lest the commerce power engulf the general police power reserved to the States.[37] Upholding § 248(a)(2) would all but eliminate that fundamental distinction. Intrastate violence "has always been the province of the States" to regulate.[38]

Even accepting that some religious organizations may offer commercial services, such as childcare, education, and the purchase and distribution of goods, § 248(a)(2) does not target violence

---

[36] *Id.*; *see also* 142 Cong Rec. S7908–04 at *S7909 (1996) (joint statement of floor managers concerning H.R. 3525, the Church Arson Prevention Act of 1996); 142 Cong. Rec. S6517–04 at *S6522 (1996) (statement of Sen. Kennedy).

[37] *Morrison*, 529 U.S. at 617.

[38] *Id.* at 618.

interfering with social services provided at houses of worship, or damage or destruction to the property of a place of religious worship. The act of worship—separate from whatever commercial endeavors religious organizations may also engage in—is in no sense a commercial or economic activity. To find otherwise would require us to layer "inference upon inference,"[39] a step that I am unwilling to take in the light of *Lopez*, *Morrison*, and the constitutional bounds on federal power.

For these reasons and the reasons stated by the majority with respect to the absence of places of worship, I would reverse the district court's denial of summary judgment to defendants.

---

[39] *Lopez*, 514 U.S. at 567.