**Abel OBABUEKI, Plaintiff,**

v.

**CHOICEPOINT, INC., and Choicepoint Services, Inc. Defendants.**

**No. 99 CIV. 11262(AGS),
99 CIV. 12486(AGS).**

United States District Court,
S.D. New York.

May 2, 2002.

---

Gregory Antollino, New York, NY, for Abel Obabueki.

Kevin G. Lauri, Jackson, Lewis, Schnitzler & Krupman, New York, NY, for International Business Machines Corp.

William C. Rand, Paul, Hastings, Janofsky & Walker, LLP, New York, NY for Choicepoint, Inc.

### MEMORANDUM ORDER

SCHWARTZ, District Judge.

This action arises out of the withdrawal of an employment offer made by International Business Machines Corporation ("IBM") to Abel Obabueki ("plaintiff"). Plaintiff originally brought this action against IBM, as well as against Choicepoint, Inc. and Choicepoint Services, Inc. (collectively, "Choicepoint"), alleging, *inter alia,* that Choicepoint had improperly pro-

vided erroneous background information about plaintiff in violation of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, and that the erroneous information caused IBM to withdraw plaintiff's job offer.

By Order dated June 14, 2001, the Court granted summary judgment to IBM on all of plaintiff's claims against the company. The Court also granted summary judgment to plaintiff with respect to his claim against Choicepoint under 15 U.S.C. § 1681b(b)(1)(A), finding that Choicepoint had failed to obtain the required certification from IBM that the information about plaintiff that was provided by Choicepoint would not be used for any illegal purpose. *See Obabueki v. International Business Machines,* 145 F.Supp.2d 371, 394–96 (S.D.N.Y.2001).

On January 25, 2002, following a three-day trial, a jury returned a verdict against Choicepoint. The jury found that Choicepoint had violated 15 U.S.C. §§ 1681e, 1681k by negligently failing to maintain required procedures designed to ensure the completeness and accuracy of its reports. The jury also found that Choicepoint's negligence caused plaintiff to sustain damages in the amount of $450,000.

Currently before the Court are: (i) plaintiff's motion for an order granting attorney's fees and costs of the litigation; and (ii) Choicepoint's motion for judgment as a matter of law pursuant to Rule 50(b) of the Federal Rules of Civil Procedure, or, in the alternative, for a new trial pursuant to Rule 59. For the reasons set forth below, Choicepoint's motion for judgment as a matter of law is granted. Plaintiff's motion for attorney's fees and costs is denied as moot.

## I. Factual Background

The following facts were presented at trial. On August 31, 1995, plaintiff pleaded *nolo contendere* in a municipal court in Santa Clara County, California, to a misdemeanor charge of committing fraud in obtaining public assistance. (Trial Transcript ("Tr.") at 9, 19). On January 27, 1997, plaintiff's conviction was set aside and dismissed by an order pursuant to California Penal Code § 1204.3. (Tr. at 9; Plaintiff's Exhibit ("Pl. Exh.") 3). The dismissal order stated that although plaintiff's conviction was set aside, he was not relieved of any "obligation to disclose the above referenced conviction in response to any direct question contained in any questionnaire or application for public office or for licensure by any State or local agency" (Pl. Exh. 3; see also Tr. at 339).

In September 1999, plaintiff applied for a job as a marketing manager with IBM. (Tr. at 9). He was interviewed by Olwyn Spencer, who at the time was IBM's Program Director for Application Development Market Management. (*Id.* at 208, 376). In a letter dated September 27, 1999, IBM offered plaintiff the marketing manager position, though the offer was contingent upon the completion of the company's "pre-employment process," which included drug screening and verification of plaintiff's application materials. (Defendants' Exhibit ("Def. Exh.") 10). As part of this pre-employment process, plaintiff filled out a form called a Security Data Sheet ("SDS"). (Tr. at 150–51; Pl. Exh. 10). The first question on the SDS asked plaintiff whether he had "been convicted of or pleaded guilty or 'no contest' to a crime or other offense" in the seven years prior to filling out the questionnaire. (Tr. at 151; Pl. Exh. 10). However, the line above Question 1 on the SDS stated that "arrests without convictions, [and] convictions or incarcerations for which a record has been sealed or expunged" need not be included as part of plaintiff's answers to the questions on the SDS. (Pl. Exh. 10).

Plaintiff was under the impression that the January 1997 dismissal order expunged his 1995 conviction, and as a result he answered "No" to the first question on the SDS. (Tr. 196–97; Pl. Exh. 10).

Choicepoint, a consumer reporting agency, was retained by IBM to perform a background check on plaintiff. (Tr. at 10.). On September 28, 1999, an individual working for Inquest, one of Choicepoint's independent contractors, went to the Santa Clara County courthouse in California to check if plaintiff had any criminal convictions. (*Id.*) On October 5, 1999, IBM received a report from Choicepoint that contained information about plaintiff's 1995 conviction but did not mention the 1997 dismissal order. (*Id.;* Pl. Exh. 16).[1] Later that day plaintiff received a call from Kathy Brown, an IBM account manager. (Tr. at 209). Brown told plaintiff that the background check had revealed the 1995 conviction, and she asked plaintiff for an explanation. (*Id.* at 209–10). Plaintiff told Brown about the 1997 order and faxed a copy of that order to Brown at her request. (*Id.* at 210). Brown showed the 1997 order, along with the Choicepoint report, to Dick Carson and Eric Ketzel, both of whom worked in the human resources department of IBM. (*Id.* at 336, 338, 349). Carson and Ketzel both concluded, after looking at both the Choicepoint report and the 1997 dismissal order, that plaintiff had lied in his response to the first question on the SDS. (*Id.*) Ketzel discussed this conclusion with Olwyn Spencer, the department manager who had interviewed Obabueki. (*Id.* at 382, 387). Spencer, who was ultimately responsible for deciding whether plaintiff should be hired, agreed with Ketzel, and as a result she decided to withdraw the offer of employment that had previously been made to plaintiff. (*Id.* at 379). Kathy Brown called plaintiff on October 14, 1999, to tell him that IBM planned to withdraw the offer. (*Id.* at 214). Five days later plaintiff received a letter from the company confirming that the job offer had been withdrawn. (*Id.* at 158–59, 217).

After plaintiff had been informed that his job offer would be withdrawn, he contacted Choicepoint to find out whether the 1997 dismissal order had been included in the report that Choicepoint provided to IBM. (*Id.* at 158, 214–16). Plaintiff informed a Choicepoint employee via telephone that his 1995 conviction had been dismissed, and he faxed a copy of the 1997 order to Choicepoint. (*Id.*). Choicepoint told plaintiff that it would investigate his case and also informed plaintiff that although the FCRA provided that the company had 30 days to address plaintiff's contention that a mistake had been made, Choicepoint would try to respond to plaintiff's inquiry in less time. (*Id.* at 216). Choicepoint then asked Inquest, its contractor in California, to obtain a copy of plaintiff's entire case file from the Santa Clara County courthouse. (*Id.* at 90). After viewing the entire file, Choicepoint sent a revised report to IBM on October 21, 1999. (*Id.* at 92; Pl. Exh. 17). This revised report stated that plaintiff's criminal record was "clear," and made no mention of either the 1995 conviction or the 1997 dismissal order. (Pl. Exh. 17). Plaintiff received a copy of the revised report on October 24, 1999, and faxed a copy of that report to IBM that same day. (Tr. at 163). Plaintiff spoke with Shelbi McCoy, an employee in IBM's human re-

---

1. Although the parties stipulated that the report was sent on October 5, 1999 (Tr. at 10), there was testimony at trial that the report was actually sent on October 1, 1999. (Tr. at 90). However, this discrepancy regarding the date of the report does not affect the Court's decision on the instant motion.

sources department, about the second report, and was told by McCoy that the company would "redo the investigation and get back" to plaintiff. (*Id.*) Plaintiff also contacted several other IBM employees in late October and early November of 1999 to find out if the company had reconsidered hiring him based on the revised Choicepoint report. (Tr. at 222–24). However, despite the existence of the revised report, IBM did not re-offer plaintiff the marketing manager position.

## II.   Legal Standard

Courts may grant judgment as a matter of law against a party when there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on a particular issue, and such judgment may be granted even after a jury has returned a verdict. See Fed.R.Civ.P. 50(a),(b). In ruling on a motion for judgment as a matter of law, trial courts are required to consider the evidence in the light most favorable to the nonmovant and to give that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence. *See Tolbert v. Queens College*, 242 F.3d 58, 70 (2d Cir.2001). The Court cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury. *Smith v. Lightning Bolt Productions, Inc.*, 861 F.2d 363, 367 (2d Cir.1988) (internal quotation marks omitted); *see also Kim v. Hurston*, 182 F.3d 113, 117 (2d Cir.1999); *Piesco v. Koch*, 12 F.3d 332, 343 (2d Cir.1993). In making its evaluation, the Court should "review all of the evidence in the record," *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), but it must disregard all evidence favorable to the moving party that the jury is not required to believe. That is, the Court should give credence to the evidence favoring the nonmovant as

well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses. *Id.* (internal quotation marks omitted).

## III.   Discussion

Choicepoint argues that it is entitled to judgment as a matter of law because none of the evidence produced at trial indicated that IBM withdrew plaintiff's job offer because of the incompleteness of the initial Choicpoint report. Rather, Choicepoint argues, the evidence clearly showed that after reviewing both the initial Choicepoint report *and* the 1997 dismissal order that plaintiff faxed to IBM on October 5, 1999, IBM concluded that plaintiff had lied on the SDS, and then decided to withdraw the job offer based on that conclusion. Choicepoint maintains that the plaintiff's provision of the 1997 order to IBM cured the inaccuracy of the initial report and thus broke the chain of causation between Choicepoint's negligent failure to comply with the FCRA and plaintiff's injury (i.e., his loss of the IBM job offer). Choicepoint also argues that there was no evidence introduced at trial indicating that Choicepoint's failure to obtain proper certification from IBM in accordance with § 1681b was causally linked in any way to plaintiff's injury.

Plaintiff argues in response that there was sufficient evidence in the record to support the jury's verdict. First, plaintiff argues that a statement made by Choicepoint in support of its cross-motion for summary judgment constituted an admission that Choicepoint's conduct proximately caused IBM to withdraw the job offer. Next plaintiff argues that even if Choicepoint's pretrial statement did not constitute an admission of proximate cause, Choicepoint clearly caused plaintiff's injury

because if Choicepoint had not been negligent it would have provided IBM with a "clean" report about plaintiff, that is, a report that mentioned neither the 1995 conviction nor the 1997 dismissal order. Plaintiff maintains that he was entitled to a "clean" report as a matter of law and asserts that if such a report had initially been issued to IBM there would have been no basis for IBM's conclusion that plaintiff lied on the SDS, and thus IBM would not have withdrawn the job offer. Plaintiff also maintains that Choicepoint's failure to obtain proper certification from IBM rendered the report regarding plaintiff illegal, and as a result Choicepoint should be fully responsible for the results of such an illegal report. ·

### A. Plaintiff's Right to a "Clean" Report

■ The issue of what exactly made Choicepoint's initial report erroneous is central to both sides' arguments. Plaintiff argues that only a report that listed no convictions for plaintiff would have been correct, and thus any mention of the 1995 conviction—even if accompanied by information about the 1997 dismissal order—rendered the report incorrect as a matter of law. Choicepoint maintains that the initial report would have been correct if it had listed the 1997 dismissal order along with the 1995 conviction.

Both sides rely on cases involving the Youth Corrections Act ("YCA"), 18 U.S.C. §§ 5005, 5021 (repealed 1984), which provided that defendants who were discharged before the expiration of the maximum term of supervision were entitled to have their convictions automatically set aside. Plaintiff relies on *Doe v. Webster*, 606 F.2d 1226 (D.C.Cir.1979), which held that an ex-offender whose conviction is set aside may legally reply in the negative to inquiries concerning the existence of that conviction. *See Doe v. Webster*, 606 F.2d at 1245. In opposition, Choicepoint relies on *U.S. v. Doe*, 36 F.Supp.2d 143 (S.D.N.Y. 1999), which held that an order setting aside a valid conviction does not require government officials to "falsely state that the defendant was not convicted." *U.S. v. Doe*, 36 F.Supp.2d at 144. In *U.S. v. Doe* Judge Martin explicitly rejected the holding of *Doe v. Webster*, noting that the earlier holding amounted to a requirement to "rewrite history." *Id.*

Though the instant action involves FCRA and not the YCA, and involves statements by a commercial credit reporting agency as opposed to federal law enforcement officials, the Court finds Judge Martin's reasoning in *U.S. v. Doe* to be persuasive. Regardless of whether the 1997 Order legally expunged the 1995 conviction,[2] it is obvious that at the time Choicepoint prepared its reports regarding plaintiff, the record of the conviction still existed and was publicly available.[3] Requiring that credit reporting agencies not

---

2. As noted in the Court's June 2001 Order, this is an unsettled issue of California law. *See Obabueki v. International Business Machines, supra,* at 382–83. However, the Court need not resolve the issue in order to decide the instant motion.

3. Plaintiff testified that the 1997 dismissal order removed his name from the Santa Clara County Municipal Court's list of case files, thus making it impossible to obtain his case file without knowing the case number (or without looking through every case file in the court's archives). (Tr. at 198–200, 225–26).

However, he does not dispute the fact that at the time that Choicepoint sent Inquest to check the court's records his case file was still publicly available to anyone who had the case number. (Tr. at 198–99). He asserted that at trial, as he does in his papers opposing the instant motion, that Inquest could have only found his case file through the use of improper procedures (Tr. at 200–01, 226–27; Plaintiff's Memorandum in Opposition to the Motion at 10), but despite these unsupported allegations he does not deny the fact that in October 1999 his case file, including the rec-

report convictions that have been set aside would, as Judge Martin held, be equivalent to "judicially mandated prevarication." *U.S. v. Doe, supra*, at 144. Employers and prospective employees might disagree as to the legal significance of the dismissal order, and such disagreement might—as in plaintiff's case—lead an employer to conclude that a prospective employee has lied when stating that he has no convictions on his record. However, a finding that there is no liability for the disclosure of publicly available records is more consistent with the FCRA's principles of truthful reporting than would be a judicially mandated policy requiring agencies such as Choicepoint to accurately interpret unsettled issues of state law, or holding those agencies liable for their customer's inaccurate interpretations of similar legal questions. Accordingly, the Court rejects plaintiff's contention that only a report indicating that plaintiff had no convictions would have been proper under the FCRA. *Cf. Cahlin v. General Motors Acceptance Corp.*, 936 F.2d 1151, 1158–59 (11th Cir.1991) (consumer whose debt to finance corporation had been satisfied by the agreed upon payment of an amount less than the amount in issue was not entitled to a credit report devoid of any negative information about the history of the account).

### B.  Proof of Causation

■ In support of its pretrial cross-motion for summary judgment, Choicepoint submitted a statement of material facts in accordance with Local Rule 56.1. Plaintiff offered that statement as an exhibit at trial (Pl. Exh. 23), and argues now that a portion of the statement constitutes an admission by Choicepoint that its initial report caused plaintiff's injury. Specifically, plaintiff cites Paragraph 28 of the 56.1 statement, in which Choicepoint stated that "[a]s a result of the information pro-

vided by Choicepoint, IBM withdrew the job offer" (*Id.* at ¶ 28); plaintiff maintains that this statement established causation as a matter of law. However, the Court held before trial that this statement did not preclude Choicepoint from presenting the issue of causation to the jury because it did not establish as a matter of law that Choicepoint caused plaintiff's injury. (Transcript of October 15, 2001 Pretrial Conference at 34–37). The jury's factual finding regarding causation does not negate the Court's prior legal conclusion; thus, the Court reiterates here that the statement in Choicepoint's 56.1 submission did not establish causation as a matter of law.

In addition, the evidence produced at trial (including the statement contained in Choicepoint's 56.1 submission) did not provide a legally sufficient basis for the jury to find as a factual matter that plaintiff's injury was proximately caused by Choicepoint's negligence. As discussed above, the inaccuracy of the initial report lay in its failure to include the 1997 dismissal order, not in its failure to report that plaintiff had no convictions whatsoever. See Section III.A, *supra*; *see also Obabueki v. International Business Machines*, *supra*, at 399. Thus, although this inaccuracy may have been caused by Choicepoint's negligent failure to maintain procedures designed to ensure the accuracy of its reports, the inaccuracy was effectively neutralized on October 5, 1999, when plaintiff faxed a copy of the 1997 dismissal order to Kathy Brown at IBM. The uncontroverted testimony of the IBM witnesses showed that the decision to withdraw plaintiff's job offer was based on IBM's consideration of both the initial Choicepoint report *and* the 1997 dismissal order provided by plaintiff. There was no evidence offered to suggest that IBM did not accept the copy of the 1997 order it re-

ord of the 1995 conviction, was publicly avail-　　able in the California court's records.

ceived from plaintiff as authentic, nor was there any evidence to suggest that the IBM employees gave the 1997 order less consideration because it came from plaintiff as opposed to Choicepoint. And after evaluating both the initial Choicepoint report and the 1997 order, IBM concluded that plaintiff had lied on the SDS. The fact that this conclusion was based on IBM's possibly erroneous interpretation of the legal effect of the 1997 order is of no consequence to the issue of whether Choicepoint caused plaintiff's injury. While Choicepoint may have provided IBM with incomplete information regarding plaintiff, the uncontested evidence offered at trial showed that IBM based its decision on information that was complete and accurate.[4] Thus, Choicepoint's negligence—which may have caused the production of the initial report—cannot be said to have been the proximate cause of IBM's decision.[5]

■ Similarly, there was no evidence offered at trial connecting any alleged resultant damages to Choicepoint's negligent failure to obtain proper certification from IBM before providing the report. Plaintiff offered nothing to show that IBM's withdrawal of the job offer resulted from the lack of certification, nor was there any indication that IBM's decision would have been affected in any way if Choicepoint

had obtained certification in accordance with § 1681b of the FCRA. Plaintiff seems to argue that because Choicepoint provided its reports to IBM without obtaining proper certification liability should be imposed upon Choicepoint, even absent any showing that the lack of certification proximately caused damage to plaintiff. However, the FCRA is not a strict liability statute; Choicepoint's violation of the statute does not relieve plaintiff of his burden to establish that those violations were the proximate cause of plaintiff's injury. As the Second Circuit held in *Casella v. Equifax Credit Information Services*, 56 F.3d 469 (2d Cir.1995), a court may properly reject a plaintiff's claims "due to a lack of causation between the harm alleged" and a defendant's "violations of the FCRA." *Casella, supra,* 56 F.3d at 474–75. As discussed above, plaintiff in this action has failed to show that his loss of the employment opportunity at IBM was proximately caused by either Choicepoint's provision of the initial incorrect report or by Choicepoint's failure to obtain proper certification from IBM. Accordingly, Choicepoint's motion for judgment as a matter of law is granted.

### Conclusion

For the reasons set forth above, Choicepoint's motion for judgment as a matter of

---

**4.** The fact that Choicepoint's second report was "clear" does not mean that the information relied on by IBM in reaching its conclusion was incomplete or inaccurate. Apparently, when confronted with the 1997 dismissal order, as well as plaintiff's assertions about the legal effect of the order, Choicepoint concluded that plaintiff's conviction had been legally expunged. This legal conclusion does not alter the complete and accurate nature of the information relied on by IBM in reaching its own conclusions, and thus it does not help to establish that the withdrawal of plaintiff's job offer was caused by Choicepoint's provision of incorrect information.

**5.** Plaintiff's invocation of the "substantial factor" test set forth in *Zuchowicz v. United States,* 140 F.3d 381, 390–91 (2d Cir.1998) is inapposite. That case involved a plaintiff whose death may have been caused by several factors, only one of which was the defendant's negligent prescription of medicine. In this case, there is no issue as to the relative effect of several factors. The plaintiff's injury was caused by only one factor—IBM's conclusion that he had lied on the SDS—and as set forth above, this conclusion did not result from the inaccuracy contained in Choicepoint's initial report.

law pursuant to Fed.R.Civ.P. 50(b) is granted, and judgment is hereby entered dismissing the complaint as against defendant Choicepoint. In the event that such judgment is subsequently vacated or reversed on appeal, Choicepoint's motion in the alternative for a new trial is conditionally granted pursuant to Rules 50(c)(1) and 59.

Because the Court has granted defendant Choicepoint's motion for judgment as a matter of law, plaintiff's motion for costs and attorney's fees is denied as moot. See 15 U.S.C. § 1681o(a)(2).

SO ORDERED.